Filed 3/12/21

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MOSANTHONY WILSON et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> THE LA JOLLA GROUP, <br><br> Defendant and Respondent. | D077134 <br><br><br> (Super. Ct. No. 37-2018-<br> 00046934-CU-OE-CTL) |


APPEAL from an order of the Superior Court of San Diego County, Richard E.L. Strauss, Judge.  Affirmed in part; reversed in part and remanded with directions.

Parris Law Firm, R. Rex Parris, Kitty K. Szeto, John M. Bickford, Ryan A. Crist, and Alexander Wheeler, for Plaintiffs and Appellants.

Manning & Kass, Ellrod, Ramirez, Trester, Kenneth Kawabata, Tonya N. Mora, and Ladell Hulet Muhlestein, for Defendant and Respondent.

Plaintiffs Mosanthony Wilson and Nancy Urschel brought a putative wage-and-hour class action against defendant The La Jolla Group (LJG). Plaintiffs worked for LJG as signature gatherers on behalf of political campaigns and political action committees.  LJG classified them as independent contractors and paid them per signature submitted.  In the

underlying lawsuit, plaintiffs alleged that LJG misclassified them and, as employees, they were entitled to a minimum wage, overtime pay, meal and rest breaks, expense reimbursement, timely final wage payment, and itemized wage statements.  Plaintiffs moved for certification of a class of LJG signature gatherers, which the trial court denied.

Plaintiffs appeal the order denying class certification.  They contend the trial court erred by finding common questions did not predominate and the class action procedure was not superior to individual actions.  They also contend the court erred by not granting a related motion for reconsideration.  We agree on the current record that the trial court erred by declining to certify a class for one cause of action, for failure to provide written and accurate itemized wage statements.  We therefore reverse the order denying class certification in part, as to that cause of action only, and remand for reconsideration.  Otherwise, we disagree that the trial court erred and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

LJG is a legal and political consulting firm.  More than 50 percent of its political work is related to signature gathering.  It acts as a broker or intermediary between organizations seeking signatures, typically political campaigns and political action committees, and the signature gatherers themselves.  The political organizations generate blank signature sheets and other materials, which LJG provides to the signature gatherers.  The political organizations pay for collected signatures, and LJG receives a percentage, typically 10 to 15 percent.  LJG may also be paid an up-front fee in some cases.

LJG works with individual signature gatherers, who actually collect the signatures from registered voters.  LJG requires the signature gatherers to sign an independent contractor agreement.  LJG does not provide training

2

to signature gatherers (except to explain the legal requirement for registered voter signatures) and does not tell them where or when to collect signatures. LJG does not require the signature gatherers to work a certain number of hours or collect a certain number of signatures. The signature gatherers choose which collection efforts to join and how much time to work on them. They call a hotline maintained by LJG to find out if there are any active signature collection efforts. Other brokers maintain their own hotlines.

The signature gatherers return collected signatures to LJG's office. LJG verifies the validity of the signatures and pays the signature gatherer based on the number of signatures, typically when the signature gatherer is next in LJG's office. The signature gatherers do not submit any record of their hours worked, and LJG does not maintain any such records.

The relationship between LJG and the signature gatherers is not exclusive. Signature gatherers may collect signatures for multiple brokers at the same time. And, if multiple brokers are working with the same political campaign or political action committee, a signature gatherer can obtain blank signature sheets from one broker and submit them to a different broker once completed.

Plaintiffs worked with LJG over a period of years. In their complaint, they alleged that LJG was "a for-profit petition drive management firm" and its usual course of business was "collecting signatures from registered voters so [that] a proposed initiative can qualify for placement on the election ballot." LJG hired signature gatherers for this effort, which plaintiffs alleged were misclassified as independent contractors under the "ABC test" for employment. (See *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903, 957 (*Dynamex*).)

Plaintiffs alleged that, as a consequence of this misclassification, LJG did not comply with various provisions of the Labor Code and the applicable Industrial Welfare Commission (IWC) wage order governing the terms and conditions of the signature gatherers' employment.  On behalf of themselves and a putative class of LJG signature gatherers, plaintiffs alleged causes of action for (1) failure to pay employees a minimum wage for all hours worked (Lab. Code, §§ 1194, 1197, 1197.1), (2) failure to pay overtime (*id*., § 1198), (3) failure to provide meal and rest breaks (*id*., § 226.7), (4) failure to timely pay final wages upon termination or resignation (*id*., §§ 201, 202), (5) failure to provide written and accurate itemized wage statements (*id*., § 226, subd. (a)), and (6) failure to reimburse employees for necessary expenditures (*id*., §§ 2800, 2802).  They also alleged a cause of action under the Unfair Competition Law (UCL; Bus. & Prof. Code, § 17200 et seq.) based on these violations.  They sought damages, penalties, restitution, and attorney fees, among other relief.

After nine months of litigation, plaintiffs moved to certify a class consisting of all individuals who worked for LJG as signature gatherers in California at any time from September 14, 2014 through the date of class certification.  Plaintiffs argued the primary issue in the litigation was the alleged misclassification of signature gatherers as independent contractors, which was common to all class members and could be proved on a classwide basis.  They maintained, "Plaintiffs' theory of classwide liability is based solely upon the 'B' prong [under *Dynamex*]—i.e., whether [LJG] can prove the signature gatherers perform work that is outside the usual course of its business."  Resolution of this issue "turns solely on:  (1) what the usual course of [LJG's] business is; and (2) whether the signature gatherers perform work that is part of this business.  Since all the signature gatherers perform the

4

same work for [LJG]—i.e., 'circulating, collecting, and turning in petitions'—the court can compare this to [LJG's] usual course of business [to] collectively determine whether the signature gatherers are properly classified."

Plaintiffs supported their motion with declarations from the named plaintiffs. Both named plaintiffs stated that they were paid by LJG based on the number of signatures collected. They asserted that they "only received a fraction of pay for the hours [they] actually spent working," they did not "receive minimum wage or overtime," and they were "not provided with meal or rest breaks, nor any form of payment for not being able to take those breaks."

Plaintiffs also supported their motion with discovery responses served by LJG. In those responses, LJG admitted that it did not pay the signature gatherers a minimum wage or overtime, or provide them with meal breaks, because they were classified as independent contractors. LJG also admitted that it did not provide itemized wage statements or reimburse signature gatherers for expenses.

LJG opposed the motion for class certification. LJG primarily contended that, even if the signature gatherers were employees under *Dynamex*, their individual circumstances were so variable that plaintiffs could not prove LJG's liability for any wage-and-hour violations on a classwide basis. LJG argued that signature gatherers had no set work days or hours, and they chose when and how long to work. Some worked a few hours per day or week, others worked many hours. Signature gatherers also worked in many different local jurisdictions, with differing minimum wage rates. Thus, in LJG's view, "there is no common proof by which a class-wide violation of overtime or minimum wage laws can be established." Similarly, LJG argued that the signature gatherers were free to stop work for a meal or

5

rest break at any time (or not) and free to purchase supplies for their own use (or not). There was no common proof by which LJG's liability on these claims could be established. LJG also maintained that there was no termination or resignation event that would trigger a final wage payment, since signature gatherers were free to resume collecting signatures at any time.[1]

Moreover, as relevant here, LJG contended that the class action procedure was not superior to individual actions. LJG noted that an individual signature gatherer could obtain blank signature forms from multiple brokers and collect signatures for multiple campaigns and committees at the same time. LJG argued, "Plaintiffs here also fail to explain how they will ascertain how long a [signature] gatherer worked in a given day or given week and whether or not he or she worked exclusively for LJG, when the evidence establishes that gatherers are free to sell the signatures they collect to any company working that petition and that gatherers frequently gathered signatures on multiple petitions at a time for multiple companies at a time."

LJG supported its opposition with declarations from a dozen signature gatherers. They confirmed they had no set hours or work locations. They worked for different brokers at the same time and did not have to turn in collected signatures to the same broker they obtained the blank petitions from. Their pay per signature varied wildly, from less than one dollar per signature to 10 or 20 dollars per signature. Many stated they could normally collect 10 or 20 signatures in an hour. A few worked more than eight hours

---

[1] In a footnote, LJG stated that "[e]ven if employee versus independent contractor status were the only issue, common questions would likely not predominate under *Dynamex*, which applies only to claims based on wage orders, and hence not to plaintiffs' business expense, final pay, and [UCL] claims."

6

per day or 40 hours per week. Most rarely or never worked such hours. The signature gatherers felt free to take breaks whenever they wanted, and they chose whether to take a meal or rest break according to their own wants and needs.

LJG also supported its opposition with excerpts from the depositions of the named plaintiffs. Wilson had done work as a signature gatherer for a number of brokers. He had several other businesses over the years and was paid by the State of California as a full-time caregiver for his special-needs child. As a signature gatherer, Wilson had the flexibility to care for his child at the same time. He could work when and where he wanted. He could collect signatures for multiple brokers and multiple campaigns or committees at the same time. He could also submit signatures to a different broker, even if he obtained blank forms from LJG. When he collected signatures outside San Diego County, he went with a partner. Wilson spent money on supplies like pens and clipboards, but he did not request reimbursement from LJG. He brought other supplies from home. Wilson claimed he worked as a signature gatherer for LJG for 10 to 12 hours per day, seven days per week, since 2014, in addition to his other jobs.

Urschel worked as a signature gatherer for a number of brokers as well. She confirmed that she could turn collected signatures into any broker handling a certain campaign or committee. She could pick up blank signature sheets from LJG but turn the collected signatures in to another broker. Urschel would try to work on issues she liked because they were more interesting. There were some issues she would not work on. LJG never told her to go to a specific location to collect signatures. Urschel would typically work six to eight hours at a time. She was free to take lunch breaks when she wanted.

On reply, plaintiffs argued that LJG's opposition focused improperly on individualized proof of damages. In plaintiffs' view, the signature gatherers' wage and hour claims depended primarily on their misclassification, which was an issue common to them all. They maintained that differing local minimum wages were immaterial because their claims were predicated on the state minimum wage only. To rebut LJG's argument that the class action procedure was not superior to individual actions, plaintiffs argued that classwide estimates of hours worked could be based on testimony from a representative group of signature gatherers or on records of signatures collected. Plaintiffs also argued that LJG did not specifically address their wage statement claim. They noted that LJG admitted in discovery it does not provide itemized wage statements. They asserted, "Therefore, if the signature gatherers were misclassified, they are all entitled to wage statement penalties."

In a tentative ruling, the trial court stated its intention to deny the motion for class certification on the grounds that plaintiffs had not shown that common questions of fact or law predominate or that class treatment was superior. At the hearing, the trial court noted that misclassification was "one issue" but there were others. Signature gatherers worked all over the state, at different wage rates, there were no time records, and "everybody's got a different story." After hearing argument, the court confirmed its tentative ruling. In a subsequent order, the court reiterated its grounds for denial and repeated its comments from the hearing.

Soon after, plaintiffs moved for reconsideration. They argued that two recently-published appellate opinions constituted "new law" requiring reconsideration because they allegedly conflicted with the order. LJG opposed. In a tentative ruling, the court noted that the California Supreme

8

Court had recently granted review of both opinions. The opinions were therefore no longer binding on the trial court. In the trial court's view, the opinions were not new law for purposes of reconsideration. At the hearing, the court confirmed its tentative. The court does not appear to have filed a formal minute order denying reconsideration.[2]

DISCUSSION

I

*Class Certification Principles*

"Originally creatures of equity, class actions have been statutorily embraced by the Legislature whenever 'the question [in a case] is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court.' " (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).) "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' " (*Ibid*.) The primary issues in this appeal are the predominance of common questions of fact or law and the superiority of the class action procedure.

---

[2]    We grant plaintiffs' unopposed motion to augment the record with the transcript of the hearing on their motion for reconsideration. (Cal. Rules of Court, rule 8.155(a)(1)(B).)

Our Supreme Court has observed "that the 'ultimate question' for predominance is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] 'The answer hinges on "whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." [Citation.] . . . "As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages." [Citations.]' [Citations.] However, [our Supreme Court has] cautioned that class treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the "class judgment" ' on common issues." (*Duran v. U.S. Bank N.A.* (2014) 59 Cal.4th 1, 28 (*Duran*).)

"A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible." (*Brinker*, *supra*, 53 Cal.4th at pp. 1021-1022.) "As one commentator has put it, 'what really matters to class certification' is 'not similarity at some unspecified level of generality but, rather, dissimilarity that has the capacity to undercut the prospects for joint resolution of class members' claims through a unified proceeding.' " (*Id.* at p. 1022, fn. 5.)

"Although predominance of common issues is often a major factor in a certification analysis, it is not the only consideration. In certifying a class action, the court must also conclude that litigation of individual issues,

10

including those arising from affirmative defenses, can be managed fairly and efficiently." (*Duran, supra*, 59 Cal.4th at pp. 28-29.) "Defenses that raise individual questions about the calculation of *damages* generally do not defeat certification. [Citation.] However, a defense in which *liability itself* is predicated on factual questions specific to individual claimants poses a much greater challenge to manageability. This distinction is important." (*Id.* at p. 30.) " 'Only in an extraordinary situation would a class action be justified where, subsequent to the class judgment, the members would be required to individually prove not only damages but also liability.' " (*Ibid.*)

"On review of a class certification order, an appellate court's inquiry is narrowly circumscribed. 'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.' " (*Brinker, supra*, 53 Cal.4th at p. 1022.)

"Under this standard, an order based upon improper criteria or incorrect assumptions calls for reversal ' "even though there may be substantial evidence to support the court's order." ' [Citations.] Accordingly, we must examine the trial court's reasons for denying class certification. 'Any valid pertinent reason stated will be sufficient to uphold the order.' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 436 (*Linder*); accord, *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 530 ["We review the trial court's actual reasons for granting or denying certification; if they are

11

erroneous, we must reverse, whether or not other reasons not relied upon might have supported the ruling."].)  Nonetheless, for the underlying factual issues, "[w]e must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record.' " (*Brinker*, *supra*, 53 Cal.4th at p. 1022.)

## II

### *Plaintiffs' Claims and Theory of Liability*

### A

Plaintiffs allege they were misclassified as independent contractors by LJG and, as a consequence, they were deprived of various wage-and-hour protections.  These protections include a minimum wage, overtime pay, meal and rest breaks, expense reimbursement, timely final wage payment, and itemized wage statements.  Echoing a recent appellate opinion, plaintiffs contend the "overarching inquiry" in this litigation is misclassification. (See *Gonzales v. San Gabriel Transit, Inc.* (2019) 40 Cal.App.5th 1131, 1163 (*Gonzales*), review granted Jan. 15, 2020, S259027.)  To demonstrate misclassification, they rely solely on "part B" of *Dynamex*'s ABC test, i.e., in order to properly be treated as independent contractors, plaintiffs must perform work that is outside the usual course of LJG's business. (*Dynamex*, *supra*, 4 Cal.5th at p. 961.)  This issue can present a common question sufficient to support class certification.  (*Id.* at pp. 965-966.)

As a threshold matter, LJG disputes that the *Dynamex* test applies to most of plaintiffs' claims.  It asserts that only plaintiffs' overtime and meal break claims are based on IWC wage orders and the remainder are based on the Labor Code.  For the latter, LJG contends plaintiffs must satisfy the test for employment described in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350-351.  Plaintiffs respond that

12

the trial court did not rely on this argument and that it is wrong on the merits.  We need not resolve these issues.  It is plaintiffs' theory of recovery that determines whether class certification is appropriate.  (*Brinker*, *supra*, 53 Cal.4th at p. 1025.)  The primary question on class certification is whether plaintiffs' theory of recovery is amenable to class treatment, not whether the theory of recovery is correct.  (*Ibid*.)  Plaintiffs' theory of recovery here is based on *Dynamex*.

B

Plaintiffs' primary contention on appeal is that the trial court erroneously denied class certification only because it believed each class member would have to individually prove his or her damages.  Plaintiffs correctly state the applicable law:  " ' "As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages." ' "  (*Duran*, *supra*, 59 Cal.4th at p. 28; accord, *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 332-333 (*Sav-On*).)

Plaintiffs point out that the trial court specifically referenced the fact that signature gatherers worked all over the state, at different wage rates, there were no time records, and "everybody's got a different story."  In plaintiffs' view, these comments show that the individual issues identified by the trial court were damages issues. We disagree.  First, neither the underlying briefing nor the trial court's order denying class certification were limited to these comments.  The court correctly articulated the legal standards governing class certification and found that "Plaintiffs have not met their burden that common questions of law and fact predominate.  In addition, Plaintiffs have not established that class treatment is superior in this case."  The court explained its reasoning "in part" with the comments

13

cited by the plaintiffs. The legal grounds cited by the court, predominance and superiority, were broader and are the correct subjects for our review. (See *Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 985-987.) Second, even limiting ourselves to the specific comments cited by plaintiffs, the court's observation that "everybody's got a different story" is not limited to damages. The "stor[ies]" told by each signature gatherer in the record include issues of liability as well, which were in part the basis for LJG's opposition.[3]

Moreover, with the exception of plaintiffs' wage statements claim, the trial court could reasonably conclude that plaintiffs had not shown that common issues predominated over individual issues on each of their claims against LJG. Each of these claims would require an individual showing of *liability*, not merely damages, given the wide variation of work experiences in the record.

The opinion in *Sotelo v. MediaNews Group, Inc.* (2012) 207 Cal.App.4th 639 (*Sotelo*) is instructive in this context. In *Sotelo*, plaintiffs brought a putative wage-and-hour class action against a newspaper publisher. (*Id.* at p. 645.) They alleged they were misclassified as independent contractors and asserted claims similar to those at issue here. (*Ibid.*) They sought to certify a class of individuals who worked for any newspaper owned by the publisher and were involved in "folding, inserting advertising materials into, bagging, bundling, loading, and/or delivering said newspaper to its residential subscribers, and/or in overseeing such work by other individuals on any such

---

[3]    The court's order did not adopt other aspects of LJG's opposition, including that the class was not ascertainable and that the named plaintiffs were not adequate class representatives. This additional fact confirms the breadth of the court's reasoning.

newspaper's behalf[.]" (*Ibid.*) The trial court denied their motion for class certification. (*Id.* at p. 647.)

On appeal, plaintiffs argued that the primary issue was misclassification and any variability in class members' work hours or schedules went to damages. (*Sotelo, supra*, 207 Cal.App.4th at p. 654.) The reviewing court disagreed. It explained, "[S]imply having the status of an employee does not make the employer liable for a claim for overtime compensation or denial of breaks. An individual employee establishes liability by proving actual overtime hours worked without overtime pay, or by proving that he or she was denied rest or meal breaks. A class, on the other hand, . . . may establish liability by proving a uniform policy or practice by the employer that has the effect on the group of making it likely that group members will work overtime hours without overtime pay, or to miss rest/meal breaks." (*Ibid.*) Because plaintiffs did not identify a common policy or practice requiring overtime or denying meal and rest breaks, which could be proved by common evidence, the trial court could properly deny class certification. (*Id.* at pp. 654-655.)

More recently, in *McCleery v. Allstate Insurance Co.* (2019) 37 Cal.App.5th 434, 438 (*McCleery*), plaintiffs identified a putative class of property inspectors. The property inspectors worked for three services companies to perform property inspections for two major insurers. (*Ibid.*) Plaintiffs alleged they were misclassified as independent contractors and brought various wage-and-hour claims based on that misclassification. (*Ibid.*) The trial court found that "common issues existed as to the class members' employment status," but it denied class certification on the ground that plaintiffs' trial plan was "unworkable because it failed to address individualized issues and deprived defendants of the ability to assert

15

defenses." (*Id*. at p. 439.) It determined that the working hours and practices of the class members varied widely: "The trial court found that inspectors fell into several subgroups: those who essentially worked full time for defendants; those who worked part time for defendants—either because they performed inspections only part time or sometimes worked for nonparty companies; those who worked with others to perform the assigned inspections; and those who interspersed inspections with other activities, such as school or parenting." (*Id*. at p. 448.) Although plaintiffs had surveyed the class members in an attempt to produce an expert report that could be used as common proof, the court found the survey inadequate. (*Ibid*.) Moreover, the court found that "plaintiffs' trial plan failed to address the wide work-practice variations among inspectors and offered no way to manage individualized issues, but simply ignored them." (*Ibid*.)

The reviewing court affirmed. (*McCleery*, *supra*, 37 Cal.App.5th at p. 439.) It explained that "the trial court reasonably concluded plaintiffs' trial plan failed to address how they could fairly establish defendants' liability on a classwide basis as to any claim." (*Id*. at p. 451.) The insurers' liability for wage-and-hour violations depended on the nature and extent of work performed by each inspector for each insurer, but there was no way to prove such work without individualized evidence. (*Id*. at pp. 451-452.)

Crucially, in response to a petition for rehearing, the *McCleery* court rejected plaintiffs' assertion that the individualized evidence at issue was relevant only to damages, not liability. (*McCleery*, *supra*, 37 Cal.App.5th at p. 454.) It explained, "Actually, we held, as discussed above, that although the trial court found common proof predominated as to 'defendants' *status as employers*,' ' "simply having the status of an employee *does not make the employer liable*." ' . . . We went on to hold that plaintiffs had failed to adduce

16

predominately common evidence as to liability against any defendant under any cause of action." (*Ibid*.)[4]

Here, as in *Sotelo* and *McCleery*, the record shows the work habits and practices of the signature gatherers vary widely. LJG does not tell signature gatherers where or how long to work. Some signature gatherers work long hours; others do not. Some work alone; others with partners. Many work other jobs. Almost all appear to work for other signature brokers. The signature gatherers can collect signatures for multiple brokers at the same time. And, because the signature gatherers can turn their collected signatures in to any broker handling that petition drive, it may be unknown during the work day which broker the signature gatherer is "working for" in any meaningful sense. As the trial court noted, each signature gatherer's "story" is different, and the court could reasonably reject class certification on that basis. For reasons we explain, the trial court could reasonably find that individual issues of *liability* predominate for the non-wage statement claims, notwithstanding the common question of misclassification. "[C]lass treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the "class judgment" ' on common issues." (*Duran*, *supra*, 59 Cal.4th at p. 28.)

Plaintiffs point out that the underlying question of misclassification is a question common to all class members. But the existence of a common

---

4    Plaintiffs attempt to limit *McCleery* to its specific context, i.e., an inadequate litigation plan. But the litigation plan in *McCleery* was inadequate because it "failed to address how they could fairly establish defendants' liability on a classwide basis as to any claim." (*McCleery*, *supra*, 37 Cal.App.5th at p. 451.) Its discussion of classwide liability is therefore relevant to the circumstances here.

question does not compel class certification.  Plaintiffs must show that common questions *predominate*, i.e., "whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Brinker*, *supra*, 53 Cal.4th at p. 1021.)  Misclassification "is only part of the equation." (*Sotelo*, *supra*, 207 Cal.App.4th at p. 654.)  The trial court could reasonably find that the common issue of misclassification did not predominate over the individual issues that would actually establish LJG's liability on the non-wage statement claims.  (See *Kizer v. Tristar Risk Management* (2017) 13 Cal.App.5th 830, 843 (*Kizer*).)  And it could, in its discretion, decline to certify a class action as to misclassification only for these claims. (See *McCleery*, *supra*, 37 Cal.App.5th at p. 456.)

Plaintiffs rely heavily on *Gonzales*, *supra*, 40 Cal.App.5th 1131, review granted, to argue that misclassification alone generally compels a finding of predominance in the wage-and-hour context.  Plaintiffs read too much into *Gonzales*'s holding.  In that case, a plaintiff brought a putative wage-and-hour class action alleging misclassification.  (*Id*. at pp. 1141-1142.)  Plaintiff sought certification of a class of taxi and van drivers who drove vehicles for the defendant.  (*Id*. at p. 1142.)  In a pre-*Dynamex* ruling, the trial court denied class certification.  (*Id*. at pp. 1140, 1146.)  On appeal, the trial court reversed and remanded for reconsideration in light of *Dynamex*.  (*Id*. at p. 1141.)

In so doing, the *Gonzales* court offered guidance for the trial court on remand.  Regarding one disputed element, typicality, the plaintiff alleged that, as independent contractors, class members "were required at their own expense to install equipment and provide tools to access [defendant's]

18

dispatch system, and to obtain insurance and perform maintenance, all expenses [plaintiff] contends should properly be borne by their employer and were denied the benefits of wage order protections." (*Gonzales*, *supra*, 40 Cal.App.5th at p. 1163, review granted.) The defendant argued that some class members leased and others owned their vehicles, which would cause a "variation" in the expenses incurred by each member. (*Ibid*.) The *Gonzales* court noted that "such a difference would likely be a function of the damages to which an individual driver was entitled. That a calculation of individual damages will, at some point, be required does not foreclose the possibility of taking common evidence on the issue of misclassification questions. [Citation.] The overarching inquiry is whether class members were misclassified during the class period. If so, as discussed in the overlapping analysis of commonality above, the class members are entitled to a determination as to whether [defendant] misclassified them as independent contractors. The fact that individual members of the class have different damages does not preclude class certification." (*Ibid*.)

Plaintiffs here argue that, like *Gonzales*, the "overarching inquiry" is misclassification and therefore common issues predominate. (*Gonzales*, *supra*, 40 Cal.App.5th at p. 1163, review granted.) But *Gonzales* did not imply, much less hold, that every putative wage-and-hour class alleging misclassification must be certified. In context, it appears the class members in *Gonzales* were all required by the defendant to incur business expenses to some extent; defendants' liability would be subject to classwide proof on the basis of its policies and practices. (See *ibid*. ["For instance, regardless of a driver's status as lessee or owner/operator, drivers were charged weekly 'lease' fees to perform services under the [defendant's] umbrella."].) The counterarguments raised by the defendant would cause, at most, a

19

"variation" in the rates or amounts. (*Ibid*.) As such, the "overarching inquiry" was misclassification, not the defendant's liability if the class members were misclassified, and any individual issues were limited to damages. Here, unlike *Gonzales*, LJG's liability for most wage-and-hour violations does not simply flow from misclassification. The trial court could reasonably find that individual proof must be considered. We consider each of plaintiffs' claims in the next part.

C

Plaintiffs' claims for overtime pay and meal and rest break violations are dependent on hours worked. "An individual employee establishes liability by proving actual overtime hours worked without overtime pay, or by proving that he or she was denied rest or meal breaks." (*Sotelo, supra*, 207 Cal.App.4th at p. 654; accord, *McCleery, supra*, 37 Cal.App.5th at p. 451.) Plaintiffs have not shown that LJG's liability for overtime pay and meal and rest break violations can be proven by classwide proof. For example, plaintiffs have not shown that LJG had any policy or practice requiring certain work hours by signature gatherers. (See *Kizer, supra*, 13 Cal.App.5th at pp. 843-844 ["Plaintiffs presented no evidence to show [defendant] had a written or de facto policy requiring claims examiners to work overtime, or that working overtime by claims examiners otherwise was subject to common proof."].) Instead, individual signature gatherers were free to work, or not, according to their own desires. They could work for LJG and another broker on the same day or even simultaneously. As such, the trial court could reasonably find that LJG's liability for overtime pay and meal and rest break violations will depend on individual proof of how long each signature gatherer worked for LJG on a given day or week.

Plaintiffs argue that "there is more than enough [in the record] to suggest the signature gatherers likely worked uncompensated overtime hours." But the fact that individual signature gatherers might have overtime claims is insufficient. (See *Kizer, supra*, 13 Cal.App.5th at p. 844.) It does not address the relevant issue, i.e., whether plaintiffs' theory of liability is common to the class by, for example, relying on "a uniform policy or practice by the employer that has the effect on the group of making it likely that group members will work overtime hours without overtime pay, or to miss rest/meal breaks." (*Sotelo, supra*, 207 Cal.App.4th at p. 654.) Plaintiffs have shown, at most, that some class members chose to work hours that would entitle them to overtime or meal and rest breaks. They have not alleged any policy or practice by LJG that prompted such work hours. (Cf. *Sav-On, supra*, 34 Cal.4th at p. 327 [plaintiffs' theory of recovery was, in part, that "defendant required all class members to work more than 40 hours per week"]; *Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286, 1302 [identifying as a "common factual issue[]" whether defendant "had a uniform policy of requiring [class members] to work overtime, but failing to pay them for their overtime hours"].) The trial court was therefore entitled to find that common issues of liability did not predominate.[5]

---

[5] Plaintiffs criticize the trial court for referencing the lack of time records as a reason to deny certification. While plaintiffs are correct that the lack of time records does not preclude certification, the trial court did not make such a broad finding. It was one of several reasons why certification was unwarranted. Plaintiffs' own authorities show that they must still come forward with some evidence tending to show uncompensated work (see, e.g., *Duran, supra*, 59 Cal.4th at p. 41), and plaintiffs have not shown the court abused its discretion by rejecting their plans for representative testimony or statistical analysis to satisfy their burden in this context.

Plaintiffs rely on *Bradley v. Networkers International, LLC* (2012) 211 Cal.App.4th 1129 (*Bradley*), but its factual circumstances were very different. In *Bradley*, the plaintiffs sought certification of a putative class of skilled technicians who were hired to provide repair and installation services at cell tower sites. (*Id.* at p. 1136.) Plaintiffs alleged they were misclassified as independent contractors and the defendant was liable for meal and rest break violations, among other wage-and-hour claims. (*Ibid.*) In a declaration, one named plaintiff asserted they received "daily assignments" from the defendant and the defendant required them to "follow specific directions as to the scheduling and priority of the work." (*Ibid.*) Once at a job site, they were " 'not permitted to leave the site until the problem was fully resolved,' " which precluded any meal or rest breaks. (*Id.* at p. 1137.) The plaintiff believed he would be fired if he took a rest break. (*Ibid.*) Other named plaintiffs and class members recounted similar experiences. (*Id.* at pp. 1137-1139.)

*Bradley* held that plaintiffs' theory of liability was amenable to class treatment. (*Bradley*, *supra*, 211 Cal.App.4th at p. 1149.) It explained, " 'An employer is required to authorize and permit the amount of [rest and meal] break time[s] called for under the wage order for its industry. If it does not . . . it has violated the wage order and is liable.' [Citation.] Claims alleging a 'uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment.' " (*Ibid.*) "[P]laintiffs' theory of recovery is based on [defendant's] (uniform) *lack* of a rest and meal break policy and its (uniform) *failure* to authorize employees to take statutorily required rest and meal breaks. The lack of a meal/rest break policy and the uniform failure to authorize such breaks are matters of common proof." (*Id.* at p. 1150.)

22

Here, by contrast, the trial court could reasonably find that plaintiffs' experiences were too varied to allow common proof of meal and rest break violations. While LJG did not have a meal or rest break policy, it also did not have a work policy. Unlike in *Bradley*, it did not impose any work hours or tasks on the signature gatherers. They were free to work (or not) and free to take breaks (or not), according to their own desires. This appeal is also unlike *Naranjo v. Spectrum Security Services, Inc.* (2019) 40 Cal.App.5th 444 (*Naranjo*), review granted Jan. 2, 2020, S258966, where the employer had an explicit policy prohibiting off-duty breaks. (*Id*. at pp. 476, 480.) Plaintiffs have not shown "a uniform policy or practice by the employer that has the effect on the group of making it likely that group members will . . . miss rest/meal breaks." (*Sotelo*, *supra*, 207 Cal.App.4th at p. 654.) While some signature gatherers may have worked a sufficient number of hours for LJG to entitle them to a rest or meal break, the trial court could find that such

liability was predominantly a matter of individual rather than common proof.[6]

LJG's liability for minimum wage violations will also depend on individual proof. (See *McCleery, supra,* 37 Cal.App.5th at p. 452.) LJG paid the signature gatherers per signature collected. They did not work any set days or hours, and the payment per signature varied wildly. Each signature gatherer would have to prove how many hours they worked for LJG, and what LJG paid them, to establish a minimum wage violation—even setting aside the issue of LJG's liability when a signature gatherer is simultaneously collecting signatures for another broker as well. The trial court could reasonably find that these individual issues predominate over the common issue of misclassification.

---

[6] Plaintiffs prominently cite the unpublished federal district court opinion in *Johnson v. Serenity Transportation, Inc.* (N.D.Cal. Aug. 1, 2018) 2018 WL 3646540 (*Johnson*), but it does not support their position on these claims. *Johnson* considered a putative class of mortuary drivers. (*Id.* at *1.) It noted that certification of minimum wage, overtime, and meal and rest break claims would be appropriate *if* plaintiffs' "on-call time," i.e., the uniform 24-hour shifts worked by each class member, were compensable. (*Id.* at *34.) But, if on-call time were not compensable, "then Plaintiffs' underlying minimum wage and overtime claims are not suitable for class certification because the actual number of hours worked by each driver other than on-call time must be determined on an individual basis" by reviewing various records and "then determining whether that particular driver worked in excess of eight hours or whether the per delivery fee was less than the minimum wage that driver was entitled to for the number of hours the driver worked." (*Id.* at *37.) For the same reason, whether the *Johnson* plaintiffs' meal and rest break claims are certifiable "also turn[ed] on whether on-call time is compensable." (*Id.* at *38.) Here, there is no on-call time. Plaintiffs' claims depend on their individual hours worked. As such, the trial court did not err in finding that individual issues predominated.

Plaintiffs argue that all class members have a minimum wage claim because LJG admits it does not pay a minimum hourly wage and "an employer *cannot* satisfy its minimum wage obligations by averaging an employee's piece-rate pay [here, pay per signature] over the hours they worked to determine in hindsight if they received [the] minimum wage for each hour worked." Plaintiffs' argument misstates the general rule. Our Supreme Court discussed wage averaging and wage borrowing in *Oman v. Delta Air Lines, Inc.* (2020) 9 Cal.5th 762, 779 (*Oman*). Although there are exceptions, the general rule is that wage averaging is permissible: "For purposes of evaluating whether an employee has received at least the hourly minimum wage for tasks or periods compensated under the contract, it is generally permissible to translate the contractual compensation—whether it be done by task, work period, or other reasonable basis—into an hourly rate by averaging pay across those tasks or periods." (*Id*. at p. 782.) Plaintiffs are therefore incorrect that LJG is liable to all class members merely by virtue of its piece-rate compensation scheme.

Plaintiffs rely on *Gonzalez v. Downtown LA Motors, LP* (2013) 215 Cal.App.4th 36, but it discussed a specific exception to the general rule. The plaintiffs in *Gonzalez* were service technicians who were paid on a "piece-rate" basis for automotive repair work. (*Id*. at p. 40.) Their actual working hours were spent on both productive time, when they were performing repair work, and nonproductive time, when they were waiting for assignment. (*Ibid*.) They sought minimum wage compensation for their nonproductive time. (*Ibid*.) Their employer argued that their compensation should be averaged over both productive and nonproductive time to determine whether they were paid the minimum wage. (*Ibid*.) On appeal, the reviewing court held that such averaging was impermissible. (*Ibid*.) "[C]lass members were

25

entitled to separate hourly compensation for time spent waiting for repair work or performing other nonrepair tasks directed by the employer during their workshifts . . . ." (*Id.* at pp. 40-41.) As our Supreme Court has explained, the rule is not against averaging, per se, but against borrowing compensation paid for one category of work and applying it to a different category: "State law prohibits borrowing compensation contractually owed for one set of hours or tasks to rectify compensation below the minimum wage for a second set of hours or tasks, regardless of whether the average of paid and unpaid (or underpaid) time exceeds the minimum wage." (*Oman*, *supra*, 9 Cal.5th at p. 781.)

Plaintiffs also argue that they were entitled to a separate minimum wage for time spent on rest breaks. (See *Bluford v. Safeway, Inc.* (2013) 216 Cal.App.4th 864, 872 ["[A] piece-rate compensation formula that does not compensate separately for rest periods does not comply with California minimum wage law."].) But this argument assumes that class treatment of plaintiffs' rest break claims would be appropriate. It is therefore unpersuasive for the same reasons as discussed above.[7]

LJG's liability for unreimbursed business expenses likewise depends on individual proof. "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." (Lab. Code, § 2802.)

_____

[7] On appeal, for the first time, plaintiffs argue that they engaged in unproductive time that should be separately compensated, such as picking up and returning signature sheets. Because this argument was not presented to the trial court, we will not consider it for the first time on appeal. (See *Nellie Gail Ranch Owners Association v. McMullin* (2016) 4 Cal.App.5th 982, 997; *Fairbanks v. Farmers New World Life Insurance Co.* (2011) 197 Cal.App.4th 544, 547 ["Plaintiffs cannot argue now that the trial court erred in failing to rule on a theory plaintiffs failed to pursue before that court."].)

26

Plaintiffs agree that "before an employer's duty to reimburse is triggered, it must either know or have reason to know that the employee has incurred an expense. Once the employer has such knowledge, then it has the duty to exercise due diligence and take any and all reasonable steps to ensure that the employee is paid for the expense." (*Stuart v. RadioShack Corp.* (N.D.Cal. 2009) 641 F.Supp.2d 901, 904.) LJG's liability therefore depends on, for each signature gatherer and each expense, whether (1) the expense was incurred in direct consequence of the signature gatherer's work *for LJG* (rather than some other broker or for some other purpose) and (2) LJG knew or had reason to know that the signature gatherer incurred such an expense in his or her work for LJG. Plaintiffs have not shown that LJG had any policy or practice requiring signature gatherers to incur expenses. (Cf. *Gonzales*, *supra*, 40 Cal.App.5th at p. 1163, review granted.) While LJG admitted it knew that signature gatherers often used furniture and materials such as pens and clipboards, it did not admit that it knew or should have known of any specific *expenditures* as a direct consequence of their work for LJG—or that any such expenditures were necessary. Even if some signature gatherers incurred reimbursable expenses, the trial court could reasonably find that individual issues predominate based on the widely varying experiences and work habits of each class member.

Similarly, LJG is only liable for failure to pay timely final wages if the wages are, in fact, final. Individual proof is required to determine whether any signature gatherer was discharged or otherwise openly ended his or her relationship with LJG, which triggered the duty to pay final wages. LJG is likewise liable for failure to pay final wages only if it did not pay. Each individual signature gatherer would have to prove such a violation. The fact that, in the abstract, "some signature gatherers have a claim" is insufficient.

For substantially the same reasons as discussed above, the trial court could also reasonably find that the class action procedure was not superior to separate individual actions for these claims. The experiences of each signature gatherer were so varied that the benefits of a class action would be undermined by numerous individual issues. (See *Ali v. U.S.A. Cab Ltd.* (2009) 176 Cal.App.4th 1333, 1353.) Because these experiences were fundamentally driven by the signature gatherers' own desires, rather than LJG's policies or practices, we will not disturb the trial court's determination that a class action was not superior. As our Supreme Court explained, "Unless an employer's uniform policy or consistent practice violates wage and hour laws [citation], California courts have been reluctant to certify class actions alleging misclassification." (*Duran*, *supra*, 59 Cal.4th at pp. 30-31.)

The foregoing discussion, however, does not apply to plaintiffs' itemized wage statement claim. LJG has a uniform policy of not providing signature gatherers with itemized wage statements. The statute likewise establishes a uniform standard of liability: An employee is "deemed to suffer injury" if an employer fails to provide a wage statement or if the wage statement fails to include certain information. (Lab. Code, § 226, subd. (e)(2)(A)-(B).) Such an employee may recover statutory penalties or actual damages for each knowing and intentional failure to provide a proper wage statement. (*Id.*, § 226, subd. (e)(1).) LJG's wage statement liability therefore depends on whether the signature gatherers were misclassified as independent contractors. (See *Johnson, supra*, 2018 WL 3646540, at *45 ["[A]s the Court understands it, [defendant] did not provide statements identifying *any* hours worked; thus, if the drivers are employees, [defendant] violated the wage statement law regardless of how many hours any particular driver

28

worked."].)  Indeed, LJG's counsel appeared to concede this point during oral argument.

Because LJG's liability on plaintiffs' wage statement claim depends on misclassification, which under plaintiffs' theory of liability is a common question, the trial court abused its discretion by determining that common questions did not predominate on this claim.  (See *Sali v. Corona Regional Medical Center* (9th Cir. 2018) 909 F.3d 996, 1011 [reversing order denying class certification for wage statement claim]; *Gomez v. J. Jacobo Farm Labor Contractor, Inc.* (E.D.Cal. 2019) 334 F.R.D. 234, 264-265 [denying class certification for most wage-and-hour claims but granting class certification for wage statement claim]; *Johnson, supra*, 2018 WL 3646540, at *45 [granting class certification for wage statement claim].)

In its briefing, LJG cites *McCleery, supra*, 37 Cal.App.5th at page 452, for the proposition that even wage statement claims could be "unmanageable" under certain circumstances.  Here, however, neither the trial court's order nor the briefing provides any grounds to refuse certification of the wage statement claim on the basis of manageability or superiority.  We therefore cannot affirm on this basis.

"We are not, however, prepared to say that class treatment necessarily is proper." (*Linder, supra*, 23 Cal.4th at p. 448.)  Class treatment of plaintiffs' itemized wage statement claim may present problems of manageability or superiority that the trial court, in its discretion, may find compelling.  We therefore will not simply direct the trial court to certify a class.  (See *Benton v. Telecom Network Specialists, Inc.* (2013) 220 Cal.App.4th 701, 731.)  On remand, the trial court should have the opportunity to consider the superiority of class treatment for this claim, standing alone, in the first instance.  (See generally *Gonzales, supra*,

29

40 Cal.App.5th at pp. 1163-1164, review granted.) We express no opinion on the issue.

III

*Motion for Reconsideration*

Plaintiffs contend the trial court erred by denying their motion for reconsideration. The basis for their motion was the publication of two new appellate opinions, *Gonzales*, *supra*, 40 Cal.App.5th 1131, review granted, and *Naranjo*, *supra*, 40 Cal.App.5th 444, review granted. Plaintiffs argued that *Gonzales* and *Naranjo* "hold that individual issues relating to how individual class members were harmed by an alleged unlawful policy does not preclude class certification." The trial court denied reconsideration. In a tentative ruling, which was never formally entered, the court noted that the Supreme Court had granted review of both opinions. It therefore found that the cases were not new law for purposes of reconsideration. Although an order denying a motion for reconsideration is not separately appealable, we may review it as part of plaintiffs' appeal from the underlying order denying class certification. (See Code Civ. Proc., § 1008, subd. (g).)

Code of Civil Procedure section 1008, subdivision (a) authorizes a party to seek reconsideration of an adverse order "based upon new or different facts, circumstances, or law." We review the court's order denying reconsideration for abuse of discretion. (*Graham v. Hansen* (1982) 128 Cal.App.3d 965, 971.)

Plaintiffs have not shown an abuse of discretion. The trial court was not required to find that *Gonzales*, *supra*, 40 Cal.App.5th 1131, review granted, and *Naranjo*, *supra*, 40 Cal.App.5th 444, review granted, were "new law" for purposes of reconsideration. Both relied on longstanding class certification principles. And, as discussed above, they were factually

dissimilar to the dispute before the court.  While plaintiffs are correct that the Supreme Court's grant of review did not *preclude* a finding that *Gonzales* and *Naranjo* were new law, they have not shown the court was *required* to make such a finding.  Nor have they substantiated their claim that the trial court was required to "explain why it did not find *Gonzales* and *Naranjo* persuasive."  They have not established reversible error.  We therefore affirm the order denying reconsideration, to the extent it is not mooted by our partial reversal of the underlying class certification order.

DISPOSITION

The order denying class certification is reversed in part as to plaintiffs' wage statement claim under Labor Code section 226.  The trial court shall reconsider certification for this claim and conduct further proceedings consistent with this opinion.  In all other respects, the order denying class certification is affirmed.  Plaintiffs' challenge to the order denying

reconsideration is moot as to the wage statement claim, but the order is otherwise affirmed. The parties shall bear their own costs on appeal.


GUERRERO, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.