Filed 1/23/23  Medina v. Under Armour Retail CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| JAVIER MEDINA,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>UNDER ARMOUR RETAIL, INC., et al.,<br><br>    Defendants and Respondents. | 2d Civil No. B322855<br>(Super. Ct. No. CIVDS1812739)<br>(San Bernardino County) |

Labor Code[1] section 2802 requires employers to reimburse their employees for expenses that are necessary and required to directly discharge their duties, or, when required by the employer.  In this case, we examine whether a claim alleging a retail employer violated section 2802 with policies encouraging (but not requiring) employees to wear its retail apparel to work presents a predominant common question of law and fact

---

[1] Further unspecified statutory references are to the Labor Code.

appropriate for class certification. We conclude that under the circumstances here, it does not.

Javier Medina sued his former employer Under Armour, Inc. and Under Armour Retail, Inc. (collectively Under Armour), alleging that Under Armour forced employees to purchase Under Armour branded clothing and shoes without reimbursement. Medina moved for class certification, which the trial court denied.

Medina appeals from the order denying his motion for class certification. Medina contends the trial court erred in finding that (1) his claims were not typical of the putative class, (2) common issues did not predominate, and (3) a class trial was unmanageable. We affirm.

FACTUAL AND PROCEDURAL HISTORY

Under Armour is a sports apparel and shoe company. It operates more than a dozen retail stores and a warehouse called the "Distribution House" in California. Distribution House oversees distribution to retail stores and provides logistical support for online orders. Employees of Distribution House generally do not interact with customers.

Medina was an employee at the Distribution House from July 2013 to July 2017. He never worked in the retail stores.

*First amended complaint*

Medina alleged Under Armour's failure to reimburse employees for wearing its retail apparel to work violated section 2802 and constituted unfair competition under Business and Professions Code section 17200 et seq. Medina alleged Under Armour "forc[ed]" employees "to patronize [Under Armour] by requiring [them] to purchase logoed clothing and shoes" and

2

"fail[ed] to reimburse" employees for business expenses. Medina sought damages and/or penalties and restitution.[2]

*Motion for class certification and opposition*

In December 2019, Medina moved to certify a class of "all current and former California employees of [Under Armour] who made purchases of [Under Armour]'s goods at any time from May 25, 2014, through the present." Medina also moved to certify a subclass of "all current and former California Distribution House employees of [Under Armour] who made purchases of [Under Armour]'s goods at any time from May 25, 2014, through the present."

Medina argued class certification was appropriate, contending the predominant common question of law and fact is "whether [Under Armour]'s policy of encouraging its employees to wear clothing/gear similar to [Under Armour]'s products, while at the same time prohibiting the wearing of competitor-branded clothing and shoes violated Labor Code § 2802." He also argued his claims were typical of the class, and a class-wide trial was manageable.

Under Armour opposed class certification, asserting Medina "fail[ed] to establish any common policy or practice *requiring* Teammates to purchase or wear UA apparel" and that the question of liability at the heart of the class-wide claims required "hyper-individualized inquiries." Under Armour also argued Medina's claims were not typical of the entire class, which included retail workers, and Medina had not proposed a trial plan to manage the "highly-individualized liability issues."

---

[2] Medina also alleged a claim under the Private Attorneys General Act (PAGA), which the parties stipulated to dismiss without prejudice.

3

In his reply, Medina argued Under Armour's opposition improperly attempted to litigate the merits at the class certification stage. Medina also filed a motion to strike the declarations of retail and distribution employees submitted by Under Armour in support of its opposition to class certification.

*Evidence*

Medina submitted excerpts from his deposition and those of Under Armour managers/persons most qualified and retail employees. He also submitted a "Team Member Handbook" that was effective in 2014 (the beginning of the putative class period) (2014 Team Member Handbook), a July 2016 "Retail Supplement To Teammate Handbook," an April 2017 "California Supplement To Teammate Handbook," a memorandum to Distribution House employees with the subject line: "Under Armour Asset Protection Policies," a document titled "Distribution House Dress Code Policy" effective in March 2018, and evidence of the employee discount policy.

Under Armour also submitted excerpts from depositions of Under Armour managers/persons most qualified and Medina. It submitted much of the same documentary evidence as Medina and other documents, including a March 2017 updated version of the "Teammate Handbook" and "PowerPoint presentation" outlining the Distribution House dress code policy. Under Armour also submitted declarations of four Under Armour managers, 15 Distribution House employees, and 55 retail employees.

*1. Teammate handbooks*

The 2014 Team Member Handbook included a section on "Personal Appearance," stating "team members are expected to present a clean and neat appearance and to dress according to

the requirements of their positions." A short list of restrictions included: "Clothing and (in the future footwear) produced by direct competitors of Under Armour should not be worn." Brenda Banuelos, Under Armour's senior manager in the human resources department, testified that the 2014 handbook policies applied to Distribution House employees up through December 2014. After December 2014, Distribution House employees were not prohibited from wearing competitor brands.

The March 2017 updated handbook included a section titled "Personal Appearance," which stated: "Although our dress code is business casual year round, it must be in keeping with the business image we wish to convey. Dressing according to the requirements of your position, as well as being neat and pulled together is essential." "Retail and Distribution House employees will receive dress codes specific to their workplaces." Nothing in this section required employees to wear Under Armour clothing, nor did it mention that employees were prohibited from wearing direct competitor clothing.

*2. Retail employee dress code policies*

A July 2016 "Retail Supplement To Teammate Handbook" included a section on "Personal Presentation," stating that retail teammates "should strive to project a professional image that is consistent with UA's reputation as the leader in the performance apparel and footwear industry." Teammates "are encouraged to wear styles and outfits in the current floor set. Additionally, teammates may not wear apparel or footwear bearing any visible logo other than UA while working." Under a "Do's" and "Don'ts" section, "Don'ts" included "[v]isible logos of any other brand" and "[c]ompetitor product (i.e., Nike, Reebok, . . . or any other brand considered by the company to be a direct competitor)." The "Do's"

section listed several Under Armour products such as branded chinos, shorts, tops, and shoes.

The April 2017 California supplement to the handbook included a section titled "California Retail Store Teammate Dress Code." It stated that retail "teammates are encouraged to wear styles and outfits in the current floor set. Although teammates are not required to wear UA clothing, teammates are not permitted to wear apparel or footwear bearing any visible logo other than UA while working." Under a "Do's" and "Don'ts" section, "Don'ts" included "[v]isible logos of any other brand." The "Do's" section listed several items such as "[a]thletic capris or pants," "[c]hinos," "[t]ank tops," and "[s]hort and long sleeve tops" without specific mention of Under Armour branded bottoms and tops. The September 2018 "Retail Supplement To Teammate Handbook" included a section on "Personal Presentation," similar to the April 2017 supplement.

*3. Distribution House dress code policies*

A memorandum to Distribution House employees, which was titled "Under Armour Asset Protection Policies," included a section for "Dress Code Policy." The dress code stated that any "clothing/footwear produced by direct competitors of Under Armour" was prohibited. This memorandum was disseminated to Distribution House employees on an annual basis. Steve Molina, a senior manager of asset protection at Distribution House, testified he drafted this memorandum in 2013 and 2014 and copied the language prohibiting direct competitor clothing from the version of the employee handbook in effect at the time. He inadvertently did not update the asset protection policy after the language prohibiting competitor clothing was removed from subsequent versions of the handbook. His failure to do so was

6

"not intentional[]." He later removed the language in 2018 after human resources informed him it was no longer in the handbook. In a 2018 email to Distribution House managers and supervisors, Molina stated the Dress Code Policy had been edited to reflect that "[v]erbiage regarding competitor clothing/apparel has been removed from the 2018 policy."

Molina testified the asset protection team was responsible to ensure employees follow the dress code policy, while the human resources department set the policy and imposed any repercussions for violations. He said in his six years at Distribution House, no employee had been reprimanded nor disciplined for wearing direct competitor apparel. Molina testified he saw Distribution House employees wear visible non-Under Armour clothing "[e]very day."

Under Armour submitted evidence of a "PowerPoint presentation" outlining Distribution House's dress code policy. According to Banuelos, after December 2014, distribution employees were informed of the dress code policy through these PowerPoint presentations (distributed in team meetings called "huddles"). The presentation included several slides of the "Do's and Don'ts" of the dress code and images of "appropriate" clothing and "inappropriate" clothing. Both appropriate and inappropriate clothing examples included images of Under Armour clothing. The presentation "encouraged" distribution employees to be brand ambassadors by wearing Under Armour clothing. Nothing in the presentation required employees to wear Under Armour clothing at work or prohibited competitor clothing.

Effective in March 2018, Under Armour created a written "Distribution House Dress Code Policy" reflecting the information in the PowerPoint presentation. It specified that teammates "are

to dress according to the requirements of their position" and that "[s]pecifically, in the [Distribution House] environment, wearing certain types of shoes and clothing may constitute a safety hazard." The policy also stated that "[t]eammates are encouraged to be brand ambassadors by wearing UA gear." The policy did not prohibit wearing competitor clothing at work.

### 4. *Medina's deposition testimony and declaration*

During his deposition, Medina recounted one instance in which a supervisor told him that it was "not correct" for Medina to be wearing a Nike T-shirt and that he "had to wear an Under Armour shirt." The supervisor asked him to put tape over the Nike logo. Medina said everything he purchased from Under Armour, he wore to work. Medina also said Under Armour had "conferences" or television presentations, in which the employees were informed of the dress code. These presentations were in English and a coworker translated the information to him. From these presentations and his interaction with his supervisor, Medina believed he was required to wear an Under Armour T-shirt and shoes to work.

Medina declared that throughout his employment, Under Armour "has always required me and other employees to wear only Under Armour branded clothing and shoes while at work" and that it prohibited employees from wearing competitor clothing.

### 5. *Management declarations*

Banuelos, a human resources manager, and Steven Snyder, a district manager, declared that Under Armour maintained separate dress codes for retail and Distribution House employees. They explained the "dress codes set forth different guidelines and serve different purposes in large part because Teammates

8

working in Retail Stores face and interact with customers, while DH Teammates generally do not." However, neither dress codes require employees to purchase and wear Under Armour apparel to work. Banuelos stated that due to the nature of the work, the Distribution House dress code "was formulated to ensure the safety of Teammates while presenting a professional appearance at work."

Snyder declared that after the December 2014 version of the handbook, Under Armour "has maintained various iterations of separate dress codes applicable to Retail and DH Teammates in California, specifically, the Retail Dress Code is set forth in California Supplement to the Teammate Handbook. . . . The Retail Dress Code applies only to Teammates who work in Retail Stores in California."

*6. Employee declarations and deposition testimonies*

Fifteen Distribution House employees declared they never felt forced to wear Under Armour clothing at work and never understood any of the policies to require them to purchase Under Armour clothing. Rather, they wore competitor clothing at work or saw other employees wear competitor clothing. They were not aware of any instance where an employee was sent home for wearing competitor apparel at work. One employee said he never purchased Under Armour clothing during his employment. Another employee said he never purchased Under Armour apparel for the sole purpose of wearing it to work. Some employees said the dress code policies were shown during television announcements or discussed during team "huddles." These policies discussed restrictions on clothes, which included certain Under Armour shirts and tank tops because they posed a safety concern at the warehouse. The employees declared that

Distribution House's dress code only restricted clothing for safety issues or to enforce appropriate professional attire in a workplace environment.

Retail employees from several stores also declared they were not expected or required to wear Under Armour clothing or shoes to work. They said they understood the dress code policy restricted visibly logoed competitor brand clothing, but they were permitted to wear competitor clothing without visible logos. Several employees declared they were not required to adhere to a certain "look" or wear up-to-date Under Armour apparel.

Medina submitted excerpts from the depositions of several employees, including five Distribution House employees. Two distribution employees acknowledged that the "Under Armour Asset Protection Policies" memorandum and 2014 Team Member Handbook included language prohibiting apparel produced by direct competitors, and one recalled receiving both documents at orientation in 2015. Nonetheless, these employees said they have seen other employees wear competitor clothing every day and that they themselves have worn competitor clothing with visible logos to work. One employee testified he had never been sent home for wearing competitor clothing.

*Order denying class certification*

The trial court issued a tentative ruling denying the class certification motion. The court found there was no dispute that the putative class was ascertainable and numerous and that Medina and his counsel would provide adequate representation. However, the court found Medina did not establish typicality, predominance of common issues, and manageability of individual issues. The court also denied Medina's motion to strike the

employee declarations submitted in support of Under Armour's class certification opposition.[3]

During the hearing, Medina argued there were several policies, which together left employees with "no choice but to purchase and wear Under Armour clothing" to work. Medina claimed the different policies directed employees to: (1) wear clothes "similar to Under Armour's look," (2) "be . . . brand ambassadors," (3) "wear styles and outfits on the current floor sets," and (4) not "wear clothing that's produced by a competitor." He argued that if "you put all those things together—and really the end result is there's no realistic choice but to wear Under Armour gear."

The trial court adopted its tentative ruling and issued a supplemental ruling. It rejected Medina's theory that there were several different dress code policies which collectively conveyed the message that Under Armour clothing had to be worn at work. The court found Medina's theory "would apply only to retail employees, where wearing Under Armour clothing makes commercial sense." These dress code policies would not apply to Distribution House employees, such as Medina, who do not interface with consumers. The court found "no evidence that *any* employees—retail or distribution—ever felt coerced to buy Under Armour clothing based on the patchwork of dress code rules." The court observed Medina failed to proffer substantial evidence to support his theory, including any declarations or deposition

_____

[3] Medina argues the trial court never ruled on this motion, but the record shows otherwise. The court denied the motion on the ground that "plaintiff has not demonstrated the coercion necessary for striking the evidence." Medina has not demonstrated any error in the court's ruling.

11

testimony from any employees.  Moreover, Medina, himself, "did not rely on this theory, but stated instead that he was *told* he had to wear Under Armour apparel—a claim apparently supported by no one else."

## DISCUSSION

"Class actions are statutorily authorized 'when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . .' (Code Civ. Proc., § 382.)" (*Johnson v. GlaxoSmithKline, Inc.* (2008) 166 Cal.App.4th 1497, 1508-1509 (*Johnson*).)  "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives.  [Citations.]  'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' [Citations.]" (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)  In addition to identifying predominant common issues, the "manageability of individual issues is just as important as the existence of common questions uniting the proposed class." (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 29 (*Duran*).)

We review the trial court's decision in denying or granting class certification for an abuse of discretion.  (*Brinker*, *supra*, 53 Cal.4th at p. 1022.)  " 'A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2)

it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.]." (*Ibid.*)

Here, the disputed issues are whether Medina demonstrated that (1) his employee reimbursement claim is typical of the class, (2) common questions of law and fact predominate, and (3) a class-wide trial of the employee reimbursement claim was manageable.

*Typicality*

Medina argues the trial court erred in finding his claims were not typical of the proposed class. We disagree.

*1. The trial court's ruling*

In concluding Medina's claims were not typical, the trial court emphasized that Medina was a Distribution House employee and not a retail employee—the latter comprising most of the putative class. The court noted that Under Armour had "separate dress code polices for retail employees and for distribution employees," and these polices had "different terms, purposes, emphases, and underlying rationales."

The trial court found Medina "failed to direct the Court to any company-wide *written* policy *requiring* employees to purchase Under Armour products to wear at work as alleged." With respect to any unwritten policy, the court found the "evidence pertaining to the distribution facility will necessarily differ from evidence pertaining to the retail stores." "Supervisors and managers at retail stores have different concerns and priorities than supervisors at a distribution facility. The dress codes are different, reflecting those differences. At most, plaintiff's claims, as a distribution employee, would be typical only of claims to be asserted on behalf of other distribution employees."

13

With respect to a "patchwork" of different policies which allegedly required employees to wear Under Armour apparel, the court found such a theory "would apply only to retail employees, where wearing Under Armour clothing makes commercial sense."

The court concluded Medina failed to demonstrate through substantial evidence that his claims were typical of retail employees. If it "were to certify a class, it would need to be limited to distribution employees."

### 2. *Analysis*

A class representative must be similarly situated to class members. (*Caro v. Procter & Gamber Co.* (1993) 18 Cal.App.4th 644, 663.) The requirement that a class representative's claim must be typical of the class is " ' "to assure that the interest of the named representative aligns with the interests of the class. [Citation.] ' "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." ' [Citations.] The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " ' [Citation.]" (*Johnson, supra,* 166 Cal.App.4th at p. 1509.)

The trial court did not abuse its discretion in finding Medina's claims were not typical of "all current and former California employees of [Under Armour] who made purchases of [Under Armour]'s goods at any time from May 25, 2014, through the present." Medina failed to show he was similarly situated to retail class members and was "injured by the same course of conduct." (*Johnson, supra,* 166 Cal.App.4th at p. 1509.) This is so because he did not show a class-wide dress policy that required

14

both retail and distribution employees to purchase and wear Under Armour retail apparel at work. Rather, there were significant differences with retail dress code policies because retail employees interact with the public, and distribution employees do not. Thus, Medina's claims may have been typical of Distribution House employees, but not typical of retail employees.

Substantial evidence supports the trial court's finding. Banuelos and Snyder declared that after 2014, Under Armour maintained two separate dress codes for retail and distribution employees because "Teammates working in Retail Stores face and interact with customers, while DH Teammates generally do not." The employee handbooks and supplements, PowerPoint presentations outlining the dress code policy for Distribution House employees, and a document regarding "Distribution House Dress Code Policy," reflect these differences. The updated 2017 employee handbook stated that "[r]etail and Distribution House employees will receive dress codes specific to their workplaces." The 2016-2018 handbook supplements for retail employees discussed an employee's personal presentation. It stated that retail employees "should strive to project a professional image that is consistent with UA's reputation," encouraged employees to wear styles and outfits in the current floor set, and prohibited visible logos of competitor brands.

In contrast, the PowerPoint presentations and the March 2018 document outlining Distribution House's dress code policy focused on safety—prohibiting clothing such as open-toed shoes, hooded sweatshirts, and loose hanging jewelry. Unlike the retail handbooks, it did not encourage employees to wear certain styles, nor did it prohibit competitor clothing. Moreover, the

"Acceptable" and "Unacceptable" clothing sections in the PowerPoint included examples of Under Armour clothing for both sections (e.g., photographs of Under Armour hooded sweatshirts were used as examples of "Unacceptable attire"). The employees at Distribution House confirmed that their dress code policies related to safety issues. They also said they wore competitor clothing or saw others wear competitor clothing while at work, while retail employees said they were not permitted to wear competitor clothing with visible logos.

Despite these differences in dress code policies, Medina argues he suffered the same injuries as retail workers because Under Armour had the "same practice" and "policies prohibiting competitor-branded clothing/shoes, while allowing only Under Armour to be worn." Medina did not support his argument with substantial evidence—after 2014, the written Distribution House dress code policies did not include such prohibitions or specifications. Moreover, Medina's testimony that a supervisor told him he must wear Under Armour while working at Distribution House is a claim that the trial court found was "apparently supported by no one else."

Medina also argued below that retail and Distribution House employees alike were subject to various policies, which together left employees with no option but to purchase Under Armour apparel. But three of the policies he identified (i.e., expectations that employees wear clothes "similar to Under Armour's look," encouragement that employees wear clothes reflecting the current floor set, and restrictions against competitive brands) were not contained in the Distribution House dress policies. Thus, Medina failed to show that he suffered the same injuries as retail workers and that his claims were typical

16

of the putative class. And as we explain below, because Medina did not show that common questions predominate and demonstrate how individual issues would be managed at trial, he cannot represent a subclass of Distribution House employees.

*Predominance of common issues*

Medina argues Under Armour 's practice of allegedly forcing employees to purchase and wear apparel representing Under Armour's "look" while prohibiting competitor brands without reimbursement presents an issue susceptible of common proof. We disagree.

*1. The trial court's ruling*

The trial court found Medina "failed to produce evidence of any *written* policy requiring employees to purchase Under Armour products" and did not produce "substantial evidence of any *unwritten* company-wide policy." "Insofar as the claim depends on unwritten practices, those would be practices imposed by the managers or supervisors at each facility. But other than [his] own testimony about his personal experience, [Medina] has failed to produce substantial evidence to demonstrate that this is a *common* factual question." Nor did Medina present substantial evidence that a "patchwork" of different dress policies collectively conveyed the message that employees had to buy and wear Under Armour apparel to work to discharge their duties or in response to Under Armour's directives as required by section 2802.

Under Armour "presented extensive evidence contradicting [Medina]'s claims, pertaining both to retail *and* to distribution employees. This is evidence not merely from management, but from employees who would presumably be class members if plaintiff's claims are true." The court further reasoned the "point, however, is not that these employees are necessarily

17

worthy of belief . . . . The point is that the truth or falsity of plaintiff's allegations would need to be demonstrated by *individualized* inquiry of a large group of employees. Since there are no *written* policies requiring employees to purchase Under Armour apparel as a condition of employment, the employees would each need to testify to what they were told *orally*."

The court concluded Medina "failed to demonstrate that common questions predominate" because "beyond his own testimony, [Medina] has failed to produce substantial evidence of his claim that employees were required to buy Under Armour."

### 2. *Analysis*

"The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytic matter, likely to prove amenable to class treatment.' [Citations.] A court must examine the allegations of the complaint and supporting declarations (*ibid.*) and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' [Citations.]" (*Brinker, supra,* 53 Cal.4th at pp. 1021-1022, fn. omitted.)

Although certification is " ' "essentially a procedural [question] that does not ask whether an action is legally or

18

factually meritorious," ' " " 'issues affecting the merits of a case may be enmeshed with class action requirements . . . .' [Citations.]" (*Brinker, supra,* 53 Cal.4th at p. 1023.) "In particular, whether common or individual questions predominate will often depend upon resolution of issues closely tied to the merits. [Citations.] To assess predominance, a court 'must examine the issues framed by the pleadings and the law applicable to the causes of action alleged.' [Citation.] It must determine whether the elements necessary to establish liability are susceptible of common proof or, if not, whether there are ways to manage effectively proof of any elements that may require individualized evidence. [Citation.] In turn, whether an element may be established collectively or only individually, plaintiff by plaintiff, can turn on the precise nature of the element and require resolution of disputed legal or factual issues affecting the merits." (*Id.* at p. 1024.)

The plaintiff has the burden to present substantial evidence that common issues of law or fact predominate over individual issues. (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1108.) On appeal, predominance of common issues is a factual question reviewed for substantial evidence. (*Brinker, supra,* 53 Cal.4th at p. 1022.) We presume in favor of the trial court's order and the existence of every fact the court could reasonably deduce from the record. (*Ibid.*)

Medina alleges Under Armour violated section 2802 by encouraging all employees to be brand ambassadors by wearing its retail apparel to work without reimbursement, and that this class-wide policy spawns predominant questions of law and fact. He argues the trial court abused its discretion when it examined

19

the merits of his underlying claim when it concluded otherwise. We disagree for the following reasons.

First, the trial court did not impermissibly examine the merits of his claim. The court ruled that the "truth or falsity of plaintiff's allegations would need to be demonstrated by *individualized* inquiry of a large group of employees." Thus, the court examined the merits of Medina's reimbursement claim only to the extent necessary to determine whether questions fundamental to determining liability could be established by common proof or individually. It did not make a substantive ruling regarding the merits of Medina's claim. (*Brinker*, *supra*, 53 Cal.4th at p. 1024; see also *Morgan v. Wet Seal, Inc.* (2012) 210 Cal.App.4th 1341 (*Wet Seal*) [the trial court properly considered the merits of the plaintiffs' causes of action for the limited purpose of assessing whether substantially similar questions regarding liability for Wet Seal's dress code policy were common to the class and predominated over individual issues].)

Second, Medina did not present substantial evidence to show a predominant common question of law or fact existed. This case is similar to *Wet Seal*, *supra*, 210 Cal.App.4th 1341. There, former retail employees sought to certify a class and alleged that Wet Seal's company-wide dress code policy forced employees to purchase and wear company apparel without reimbursement. (*Id.* at p. 1345.) Although employees were not required to purchase Wet Seal apparel, the plaintiffs argued otherwise and relied on employee handbooks, "Policies & Procedures" manuals, and seasonal handbooks. These documents stated that employees were " 'required to dress in a manner . . . consistent with the current fashion attire that is reflected in the stores,' " to " 'wear clothing consistent with Wet Seal's brand,' " or

20

to "represent the Arden B brand, current fashion trends and current color stories presented on the sales floor." The policies stated: " 'Employees are encouraged to wear Wet Seal merchandise at all times.' " (*Id.* at pp. 1347-1349.) The plaintiffs also submitted their own declarations and those of over 50 other employees, many of whom said their managers told them they were required to dress in Wet Seal apparel. (*Id.* at pp. 1350-1351.) The plaintiffs also submitted e-mails from one regional district director, who sent e-mails to store managers expressing her concern that employees were " 'not dressing for Wet Seal' " or "wearing the 'new trends.' " (*Id.* at p. 1352.)

In opposition, Wet Seal submitted more than 100 declarations from managers and sales associates who said they did not interpret the dress policies to require them to wear Wet Seal clothing. (*Wet Seal*, *supra*, 210 Cal.App.4th at p. 1351.)

The Court of Appeal affirmed the denial of class certification, concluding there was "no class-wide method of proof with regard to the fundamental liability questions" at the heart of the plaintiff's claim. (*Wet Seal*, *supra*, 210 Cal.App.4th at p. 1362.) The court found the evidence of the various written policies were insufficient to prove Wet Seal had a company-wide policy requiring employees to wear and purchase Wet Seal items without reimbursement. (*Id.* at pp. 1362, 1365.) With respect to the declarations, the named plaintiffs' declarations demonstrated their claims were based on oral instructions from their specific managers. The other employee declarations demonstrated that employees were told different things about the company's dress policies. The court found that such "anecdotal evidence regarding Wet Seal's application of its dress code" "reinforces the conclusion that Wet Seal's liability to putative class members will have to be

decided on an individualized basis." (*Id*. at p. 1362.)  Moreover, evidence of one regional director's e-mails did not establish the director was able to determine company-wide policy for Wet Seal, and there was no evidence that such e-mails were widely disseminated.  (*Id*. at p. 1365-1366.)

Similarly here, Medina did not present substantial evidence that common issues of law and fact predominated over individual ones.  As in *Wet Seal*, Medina did not present substantial evidence of a company-wide policy requiring employees to purchase and wear Under Armour apparel to work. The evidence includes the 2014 Team Member Handbook and the "Under Armour Asset Protection Policies," which only restricted employees from wearing clothing "produced by direct competitors."  Subsequent versions of the retail employee handbook supplements in 2016, 2017, and 2018 modified this restriction to only prohibit retail employees from wearing visible logos of competitor brands.  These supplements also encourage, but do not require, retail employees to wear styles and outfits in the current floor sets and to be "brand ambassadors."  After 2014, Distribution House dress code policies, presented through PowerPoint presentations, did not restrict employees from wearing competitor clothing.  The policy included an "Acceptable" and "Unacceptable" of the dress code, using Under Armour apparel for *both* the examples of appropriate and inappropriate workplace clothing, and this section merely encouraged employees to be "brand ambassadors by wearing UA gear." These documents do not demonstrate Under Armour forced employees to buy its apparel to discharge their duties as brand ambassadors.

22

Furthermore, Medina produced no other employee declarations or deposition testimonies to support his claim that Under Armour had a company-wide policy that forced employees to wear Under Armour apparel at work. In contrast, Under Armour submitted over 70 Distribution House and retail employees' declarations in which employees stated they were not forced to purchase Under Armour apparel to wear at work, and never understood the written policies to pressure them to make such purchases to discharge their duties. Several employees said they were permitted to wear competitor clothing to work, wore competitor clothing to work, or saw other employees wearing competitor brands every day. And, some employees said they never purchased an Under Armour item for the sole purpose of wearing it to work.

Moreover, like *Wet Seal*, the employee and Medina declarations and deposition testimonies "reinforces the conclusion that [Under Armour]'s liability to putative class members will have to be decided on an individualized basis." (*Wet Seal, supra,* 210 Cal.App.4th at p. 1362.) Medina's claim is based on what he was told by a supervisor and on his own interpretation of the policies. The employee declarations and deposition testimonies illustrate that their understanding of the various dress policies was based on how they interpreted them or how their supervisors communicated these policies. Thus, Medina has failed to demonstrate a "classwide method of proof with regard to the fundamental liability questions" such as how each employee understood the written dress policies, how each employee was instructed to dress by their managers or supervisors, and whether each employee relied on such instruction or policy

23

interpretations to purchase Under Armour clothing for the purpose of wearing those items to work. (*Ibid.*)

*Manageability*

Lastly, the trial court found Medina "failed to demonstrate through a trial plan that this case would be manageable as a class action," particularly "in light of the need for extensive individualized inquiries."

"In certifying a class action, the court must also conclude that litigation of individual issues . . . can be managed fairly and efficiently. [Citations.]" (*Duran*, *supra*, 59 Cal.4th at p. 29.) Trial courts must pay careful attention to manageability when deciding to certify a class action. In considering whether a class action is a superior device for resolving a controversy, the manageability of individual issues is just as important as the existence of common questions uniting the proposed class. (*Ibid.*)

In the absence of Medina submitting a trial plan, we agree that a class-wide trial would be unmanageable given our conclusion that the threshold question of liability would require individualized inquiries. Medina has not shown through a trial plan how the individualized liability inquiries can be managed fairly and efficiently.

Medina argues that trial would be manageable because Under Armour "keep[s] records of all class member purchases showing how much each class member spent" on apparel. But "[e]vidence that putative class members purchased [Under Armour] merchandise is not evidence that they were forced to purchase that merchandise." (*Wet Seal*, *supra*, 210 Cal.App.4th at pp. 1366, 1369.) Even with such evidence, individualized inquiry would be necessary to determine questions such as whether the purchase was for the purpose of wearing the item to

24

work, whether the purchase was for the employee or a family/friend, or whether employees chose to avail themselves of an employee discount. Medina does not show how such inquiries can be managed. Based on the record before the trial court, we conclude the court did not abuse its discretion in finding this case unmanageable. (See *McCleery v. Allstate Ins. Co.* (2019) 37 Cal.App.5th 434, 452.)

DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

NOT TO BE PUBLISHED.

BALTODANO, J.

We concur:

GILBERT, P. J.

YEGAN, J.

David S. Cohn, Judge

Superior Court County of San Bernardino

_____

Diversity Law Group, Larry W. Lee; Law Offices of Choi & Associates, Edward W. Choi; Hyun Legal, Dennis S. Hyun; Lee Law Offices and Thomas M. Lee for Plaintiff and Appellant.

Seyfarth Shaw, Andrew M. McNaught, Ryan A. McCoy and Kiran A. Seldon for Defendants and Respondents.